UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

Robert Wayne Goosen,                          File No. 21-cv-02575 (ECT/LIB)

       Plaintiff,

v.                                                        **OPINION AND ORDER**

Minnesota Department of Transportation,

       Defendant.

---

Kelly A. Jeanetta, Kelly A. Jeanetta Law Firm LLC, Minneapolis, MN, for Plaintiff Robert Wayne Goosen.

Joseph D. Weiner, Minnesota Attorney General's Office, St. Paul, MN, for Defendant Minnesota Department of Transportation.

---

Plaintiff Robert Wayne Goosen worked as a heavy-equipment field mechanic for Defendant Minnesota Department of Transportation (or "MNDOT"). He suffered a work-related injury. After reaching maximum medical improvement, Goosen asked to return to the heavy-equipment-field-mechanic position. MNDOT said no. It determined that Goosen was not qualified to perform some of the position's essential functions and that it was not able to reasonably accommodate Goosen's physical limitations. In this case, Goosen alleges that MNDOT violated the Americans with Disabilities Act. MNDOT seeks summary judgment, and the motion will be granted. At least on this record, no reasonable jury could find either that Goosen was qualified to perform the essential functions of his former position or that a reasonable accommodation was possible.

I[1]

MNDOT hired Goosen in February 2008.  ECF No. 36-1 at 4.  He was employed initially in a temporary heavy-equipment-mechanic position.  *Id.* at 37.  Three months later, MNDOT put Goosen in a permanent heavy-equipment-mechanic position.  *Id.* at 5.  In April 2011, MNDOT promoted Goosen to the heavy-equipment-field-mechanic position. *Id.* at 5.

As a heavy equipment field mechanic, Goosen was tasked with "perform[ing] skilled diagnostics via advanced technology computer software to troubleshoot mechanical and electrical[] problems for the repair and maintenance" of "heavy and light duty vehicles" as well as "specialized equipment for snow and ice control, construction, road and site maintenance purposes."  ECF No. 36-1 at 44.  Goosen's responsibilities were apportioned as follows:

- Diagnose and repair equipment problems so that downtime is minimized and equipment is available when needed.  (35%)

- Conduct preventative maintenance inspections on and repair equipment as needed so that all equipment is in specified condition and accurate records are available.  (20%)

- Repair and/or fabricate parts, when needed, so that equipment is operational.  (15%)

- Use all required computer programs . . . so that repair information is recorded accurately and available for use by others.  (10%)

- Work on equipment in remote field locations, truck stations, shops, and other locations as necessary.  Provide leadership, direction and be responsible for making decisions as delegated

---

[1]   The facts are undisputed or described in a light most favorable to Goosen.  Fed. R. Civ. P. 56(a).

by the supervisor so that planned and emergency repairs are completed.  (10%)

- Maintain individual/state tool inventory so that all tools are in usable condition and accounted for.  (5%)

- Work with shop supervisor, shop employees and other stakeholders to look for opportunities to improve processes in order to create greater efficiencies in work flow and/or work procedures.  (5%)

ECF No. 36-1 at 44–48.  In other words, eighty percent of Goosen's responsibilities involved maintenance and repair of equipment, with roughly ten percent of this work occurring in remote locations.  *See id.*

On June 27, 2018, Goosen suffered an on-the-job injury to his left arm.  *Id.* at 14. While working on a truck, he heard a snap or a pop in his left elbow, and the fingers on his left hand went numb.  *Id.*  Goosen promptly reported the injury to his supervisor, Steve Scholand, then went to a clinic.  *Id.*  Medical personnel determined that Goosen had injured his ulnar nerve.  *Id.*

On August 7, 2018, Goosen was cleared to return to work in a light-duty capacity; he was not authorized to lift or carry any weight, push or pull any weight, climb any ladders, or use his left arm in an outstretched position, for firm gripping or grasping, for overhead reaching, or to operate vibrating tools.  ECF No. 36-1 at 51.  Goosen worked in his light-duty role until the COVID-19 pandemic began in February 2020; he then worked remotely and took sick leave until October 2020 when he began a one-year leave of absence.  *Id.* at 16, 52.

Goosen underwent four surgeries to address the injury—in September 2018, February 2019, June 2019, and May 2020.  *Id.* at 15–16.  After his last surgery, Goosen

3

underwent a physical-therapy (or "work hardening") program, which he completed in March 2021. *Id.* at 17.

On April 1, 2021, Goosen was examined by his treating physician, L. Pearce McCarty, M.D., to evaluate his ability to return to work. *Id.* at 18. Dr. McCarty determined that Goosen could return to work but imposed temporary work restrictions. *Id.* at 56–57. That same day, Dr. McCarty completed a form entitled "MNDOT Report of Workability for Work Injuries." ECF No. 41-2 at 27. On this form, Dr. McCarty indicated that Goosen could return to work with restrictions from April 1, 2021, through April 29, 2021. *Id.* Dr. McCarty also reported on the form that Goosen had not reached maximum medical improvement, or MMI. *Id.*; *see also* ECF No. 36-1 at 19.

On April 9, 2021, without seeing Goosen again, Dr. McCarty completed the MNDOT Report of Workability for Work Injuries form a second time. ECF No. 36-1 at 59. Dr. McCarty again identified Goosen's various work restrictions, but also indicated that these restrictions were permanent. *Id.* at 59–60. Though Dr. McCarty wrote that Goosen had reached maximum medical improvement as of April 9, 2021, Dr. McCarty elsewhere indicated that the permanency of Goosen's disability status was "[u]ndetermined." *Id.* at 59. Dr. McCarty's office faxed this form to Goosen's qualified rehabilitation consultant, LaMay Wagendorf, on April 12, 2021. *Id.* at 58. The cover page accompanying the fax described the form as a "[c]orrected copy." *Id.*

The restrictions Dr. McCarty identified on the April 9 form are at the center of this case. On the form, Dr. McCarty indicated that, as of April 1, 2021, Goosen was authorized to return to work with limitations. *Id.* Dr. McCarty authorized Goosen to return to work

more than 5 days per week for over 10 hours per day. *Id.* Goosen was authorized to work overtime. *Id.* However, Dr. McCarty restricted Goosen from lifting or carrying over 60 pounds for more than three hours per day, 41 to 60 pounds for more than six hours per day, and 21 to 40 pounds for more than seven hours per day. *Id.* Goosen was unable to push or pull over 75 pounds for more than three hours per day and 51 to 75 pounds for more than seven hours per day. *Id.* He was restricted from entering or exiting heavy equipment with three-point contact, and climbing ladders or stairs, for more than seven hours per day. *Id.* He was unable to drive heavy equipment for more than six hours per day. *Id.* He was unable to crawl for more than three hours per day, to kneel or squat for more than six hours per day, and to sit, stand, or walk for more than seven hours per day. *Id.* Further, Goosen was limited to use of his left arm to seven hours per day, to working with his arms outstretched for no more than three hours per day, and for overhead reaching or use of his arms above his shoulders to no more than six hours per day. *Id.* His use of vibrating tools was limited to no more than three hours per day with his left hand, and seven hours per day with his right hand. *Id.* Dr. McCarty listed vibration on Goosen's left arm as a "Sensory/Environmental Limitation[]." *Id.* Lastly, Dr. McCarty noted that Goosen was "able to take stretch breaks, as needed, and work at his own pace." *Id.* Goosen sought a second opinion from a different doctor, who agreed with Dr. McCarty's assessment and restrictions. *Id.* at 18–19.

After receiving the work restrictions from Dr. McCarty, MNDOT convened a group—formally called a "Work Analysis Team"—to determine if it could accommodate

Goosen's restrictions. *See id.* at 19. The team met nine times from April 6, 2021, to May 6, 2021. ECF No. 37-1. The team's members included:

- Workers' Compensation Program Manager Sandra Gram;
- Goosen's qualified rehabilitation consultant, LaMay Wagendorf;
- Goosen's supervisor, Steve Scholand;
- Goosen's second level supervisor, Tony Bowe;
- Senior Engineer Paul Konickson;
- State Program Administration Principle of the Office of Equity & Diversity Ken Rodgers;
- State Program Administration Manager Senior, Human Resources Brad Scott;
- Human Resources Supervisor 3 Theresa Schermerhorn;
- Safety Administrator Cole Weber;
- Labor Relations Consultant 2, Human Resources Management Bradley Heckes;
- State Program Administration Supervisor Principle, Safety & Workers' Compensation Sue Kielty; and
- Field Representatives-Duluth, AFSCME Council 5 Rick Frauendienst/Bryce Wickstrom.

ECF No. 37-1.

Workers' Compensation Program Manager Gram coordinated the review process and compiled the team's work into an Excel file the Parties refer to as the "Tracking Document." ECF No. 37-1. The Tracking Document contains a table listing descriptions of the various responsibilities—and the corresponding tasks associated with those responsibilities—of the heavy-equipment-field-mechanic position. *Id.* The Work Analysis Team identified ways in which Goosen's permanent restrictions might or would be

exceeded by performing those tasks. *Id.* The Work Analysis Team then noted whether options were available to accommodate Goosen's permanent restrictions on a task-by-task basis. *Id.* Some tasks have a potential accommodation listed. For example, for a "Maintain shop cleanliness" task, the Work Analysis Team wrote that "[c]leaning duties can be postponed until the next morning if HEFM would exceed restrictions." *Id.* In the majority of its notes, however, the Work Analysis Team explained why no reasonable accommodation was available. For example, regarding the task "Repair and preventive maintenance for all equipment, vehicle modifications and retro-fitting of equipment," the Work Analysis Team explained:

> Physical restrictions could not be considered at the point of job assignment because it's unknown what the repair requirements will be. Any ticket could very possibly reach a point that exceeds restrictions, and it would not be reasonable to give the job to another worker at the point restrictions are exceeded due to the duplication of work. While most workers could ask for assistance when needed with lifting, the HEFM often works alone in remote locations. However, when given the opportunity, jobs that require more tear down and reassembly are usually not given to the HEFM (again, not in remote locations). Both hands can be used using one to assist while pushing, pulling and applying torque but when using vibrating tools, the vibration will often be felt in both arms. The physical restrictions and weights quoted do not consider the varied torque required.

*Id.* In another entry related to repair and preventive maintenance of equipment, the Work Analysis Team wrote that performance of the task requires "[p]rolonged overhead positions with impact tools," "[a]wkward positions" such as under a vehicle, as well as "repeated bilateral arm, shoulder and forearm flexion, extension, internal rotation, external rotation abduction, adduction and occasionally circumduction while holding objects away from the

body and applying torque or hammering." *Id.* Regarding this requirement, the Work Analysis Team wrote:

> We are unable to accommodate or modify the overhead work required since it is the nature of the work. Worker may have difficulty with the kneeling and squatting or climbing in and out of equipment repeatedly because he might use his arms to assist. . . . This work is done in overhead or outstretched positions depending on the task. The ideal ergonomic position is very rare—hardly even 1% of the time.

*Id.* The Work Analysis Team concluded that Goosen could not perform the essential functions of the heavy-equipment-field-mechanic position with or without a reasonable accommodation. ECF No. 36-2 at 7–8.

Goosen met with the Work Analysis Team and was provided with the Tracking Document one week before this meeting. ECF No. 36-1 at 22. At the meeting, Goosen did not contest any information in the Tracking Document. *Id.* The Work Analysis Team raised concerns that Goosen could not perform the duties of a heavy equipment field mechanic given his restrictions and asked if he had any ideas regarding accommodations that might work. *Id.* at 27–29. Goosen suggested only that he could take stretch breaks. *Id.* at 29 ("Then from there, there was more talk and stuff like that, asked about accommodations that were -- that I asked for, and the only thing I asked for was . . . a stretch break, which should be common to anybody in any situation."). The meeting was adjourned to provide time to identify other potential accommodations and for MNDOT to consider whether Goosen might qualify instead for a heavy-equipment-mechanic position. ECF No. 36-1 at 29; ECF No. 36-2 at 10; ECF No. 36-4 at 8.

The Work Analysis Team reconvened with Goosen on May 6, 2021.  Goosen said he had identified no new ideas regarding potential accommodations.  ECF No. 36-1 at 30. The Work Analysis Team determined that MNDOT could not accommodate Goosen in the heavy-equipment-mechanic position for the same reasons identified for the heavy-equipment-field-mechanic position, and because there were not open positions. ECF No. 36-2 at 11–12.  MNDOT then offered to assist Goosen with a job search both in and outside of MNDOT, but Goosen did not participate in the program.  ECF No. 36-1 at 31.

On October 12, 2021, Goosen's one-year leave of absence ended.  *Id.* at 61. MNDOT's notification letter to Goosen noted that the agency had provided Goosen with "FMLA Leave of absence for 12 weeks," "[a] 1-year Unpaid Medical Leave of Absence as an ADA Reasonable Accommodation and in accordance [with his] collective bargaining agreement," and "Job Postings for three months as an ADA Reasonable Accommodation." *Id.*  Because Goosen was unable to return to work and had not found another job within MNDOT, MNDOT considered the end of his employment a voluntary separation.  *Id.*

II

The Parties dispute whether three affidavits[2] Goosen filed in opposition to MNDOT's summary-judgment motion properly may be considered. *See* ECF Nos. 43, 44, and 45. These affidavits were signed by Clifford Theis, Scott Wistrom, and Dale Sauer. *See id.* Theis, Wistrom, and Sauer each worked for MNDOT as a heavy-equipment or heavy-equipment field mechanic. ECF No. 43 ¶¶ 1, 2; ECF No. 44 ¶ 1; ECF No. 45 ¶¶ 2, 3. Theis, Wistrom, and Sauer testify that the physical requirements they encountered in performing their mechanic positions were not as demanding as the physical requirements the Work Analysis Team—and hence MNDOT—identified as being essential to the heavy-equipment-field-mechanic position. *See* ECF No. 43 ¶¶ 3–5; ECF No. 44 ¶¶ 6–11; ECF No. 45 ¶¶ 4–5. The three affidavits were signed and notarized during January and March of 2023. ECF No. 43 at 2; ECF No. 44 at 3; ECF No. 45 at 2. The period during which the parties were to conduct all fact discovery ended December 31, 2022. ECF No. 31 at 1–2.

Parties must, without awaiting a discovery request, disclose the identity "of each individual likely to have discoverable information—along with the subjects of that information—that the disclosing party may use to support its claims or defenses[.]" Fed.

---

[2]    Goosen filed a fourth affidavit, this one of union representative Richard Frauendienst. ECF No. 46. Though MNDOT argued for exclusion of this fourth affidavit in its Reply Brief, ECF No. 47 at 4–6, it did not address this affidavit specifically in its briefing (or at all at the hearing). Frauendienst's affidavit will not be excluded. Goosen disclosed Frauendienst in an interrogatory answer, identifying him as a union representative. ECF No. 48-1 at 3 ("Richard Frauendiest [sic] – AFSCME Council 5 field representative."). In his affidavit, Frauendienst testifies regarding subject matter related to his role as an AFSCME field representative. ECF No. 46.

R. Civ. P. 26(a)(1)(A)(i).  "If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless."  Fed. R. Civ. P. 37(c)(1).  "[F]ailure to disclose in a timely manner is equivalent to failure to disclose.  *Trost v. Trek Bicycle Corp.*, 162 F.3d 1004, 1008 (8th Cir. 1998) (citing *Sylla-Sawdon v. Uniroyal Goodrich Tire Co.*, 47 F.3d 277, 284 (8th Cir. 1995)).  "A district court may exclude such . . . testimony as a self-executing sanction when the party's failure is not substantially justified or harmless."  *Niazi Licensing Corp. v. St. Jude Med. S.C., Inc.*, No. 17-cv-5096 (WMW/BRT), 2020 WL 1617879, at *2 (D. Minn. Apr. 2, 2020), *aff'd* 30 F.4th 1339 (Fed. Cir. 2022).

Goosen did not timely disclose Theis, Wistrom, or Sauer.  Goosen did not identify Theis, Wistrom, or Sauer in his disclosures or answers to interrogatories.  ECF No. 48; ECF No. 48-1.  Nor did Goosen identify Theis or Wistrom in any deposition testimony.  Goosen points out that during his deposition he mentioned Sauer.  Goosen Dep. 220–21.[3]  Goosen, however, did not identify Sauer as having discoverable information relating in any way to the substance of Sauer's (or Wistrom or Theis's) affidavit testimony.   In his deposition, Goosen testified only that he had spoken to Sauer in relation to a grievance Goosen had filed relating to his medical insurance coverage while under workers' compensation.  This portion of his deposition reads:

---

[3]     That portion of the transcript of Goosen's deposition in which he mentions Sauer is not in the case file.  Goosen's counsel submitted a paper copy to the Court and MNDOT's counsel at the hearing.

Q: Now when you say you filed a grievance related to your medical insurance, what was the nature of that grievance?

A: The nature of the grievance is this other guy, Rick – or Dale Sauer – actually, Dale would be another former MnDOT – or a MnDOT employee that I was talking with. He was going through a workers' comp. claim, too, there and Rick [Frauendienst] had contacted me with Dale and he was also – I knew Dale from the – he was a mechanic from the conventions and stuff. And then, also, he was the president of his union down in St. Cloud . . . We talked back and forth about several things. I guess I forgot what the original question was.

Q: The question was about the medical insurance. What was it that you were grieving?

A: Yes, that – the way that Dale and I read the one clause, and Jason read it, too, there, that as long as I was under workers' comp., I could continue to receive my medical through the State.

Goosen Dep. 220–21. This testimony in no way identifies Sauer as having discoverable information regarding the physical requirements of either the heavy-equipment or heavy-equipment-field-mechanic position.

The next question is whether Goosen's failure to disclose these witnesses "was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). "District courts . . . consider four factors when determining whether a violation was substantially justified or harmless under Rule 37(c): [1] the importance of the excluded material; [2] the explanation of the party for its failure to comply with the required disclosure; [3] the potential prejudice that would arise from allowing the material to be used . . .; and [4] the availability of a continuance to cure such prejudice." *Watkins Inc. v. McCormick & Co., Inc.*, No. 15-cv-2688 (DSD/ECW), 2023 WL 1777474, at *2 (D. Minn. Feb. 6, 2023) (citations and

quotations omitted).  "The burden of establishing substantial justification and harmlessness is upon the party who is claimed to have failed to make the required disclosure."  *Nguyen v. IBP, Inc.*, 162 F.R.D. 675, 680 (D. Kan. 1995).

Goosen has not shown either substantial justification or harmlessness.  (1) In Goosen's view, the Theis, Wistrom, and Sauer affidavits are important because these witnesses dispute the accuracy of the physical requirements the Work Analysis Team and MNDOT identified as being essential to the heavy-equipment-field-mechanic position. Goosen, in other words, takes the position that the affidavits support the conclusion that he is physically capable of performing the position's essential functions.  Considering how important this information is to Goosen's theory of the case, it is difficult to understand why he did not disclose the information much earlier in the case.  (2) Goosen's explanation for his failure to comply is not compelling.  At the hearing, Goosen explained that he did not identify Theis, Wistrom, or Sauer as having relevant information until December 2022. The discovery deadline, however, was extended from November 1, 2022, to December 31, 2022.  ECF Nos. 20, 31.  This extension gave Goosen the opportunity to timely supplement his disclosures and discovery responses by identifying Theis, Wistrom, and Sauer within the discovery period.  *See* Fed. R. Civ. P. 26(e)(1) ("A party who has made a disclosure under Rule 26(a)—or who has responded to an interrogatory, request for production, or request for admission—must supplement or correct its disclosure or response . . . in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing[.]").

Goosen's justification might be persuasive if MNDOT or a third-party controlled Theis, Wistrom, or Sauer, or if Goosen's access to them was limited in some other way. We don't have anything like that. As far as the record shows, these witnesses were known and freely available to Goosen from the case's beginning. (3) MNDOT would be prejudiced by the inclusion of these witnesses' affidavits. Goosen's untimely disclosure left MNDOT no opportunity to depose the witnesses within the discovery period. (4) A continuance is not appropriate. To reopen discovery would require MNDOT to incur additional costs and would unduly delay resolution of this action. *Marmo v. Tyson Fresh Meats, Inc.*, 457 F.3d 748, 759 (8th Cir. 2006) ("Adherence to progression order deadlines is critical to achieving the primary goal of the judiciary: 'to serve the just, speedy, and inexpensive determination of every action.'" (quoting Fed. R. Civ. P. 1)). For these reasons, the affidavits of Theis, Wistrom, and Sauer will not be considered in deciding MNDOT's summary-judgment motion.

III

Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" only if its resolution might affect the outcome of the suit under the governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute over a fact is "genuine" only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [their] favor." *Id.* at 255.

Goosen asserts a "reasonable accommodation" ADA claim.  This is how Goosen characterizes his claim.  He says the only issues are "whether [he] was able to perform the essential functions of the [heavy-equipment-field-mechanic] job with or without reasonable accommodation and whether placing him into [a heavy-equipment-mechanic] position was a reasonable accommodation."  ECF No. 40 at 19.

The Eighth Circuit applies a "modified burden-shifting analysis" to ADA reasonable-accommodation claims.  *Fenney v. Dakota, Minn. & E. R.R. Co.*, 327 F.3d 707, 712 (8th Cir. 2003).  This approach requires a plaintiff to show "that he has an ADA disability," "that he has suffered adverse employment action," and that he is a "'qualified individual.'"  *Id.*  For purposes of this motion, Goosen and MNDOT agree that Goosen has an ADA disability and that Goosen's loss of MNDOT employment qualifies as an adverse employment action.  *See* ECF No. 35 at 17 ("For purposes of summary judgment, MNDOT does not dispute that Goosen has an ADA disability or that he suffered an adverse employment action."); ECF No. 40 at 18–19.  The issue, then, is whether Goosen was a "qualified individual."

"To be a 'qualified individual' within the meaning of the ADA, an employee must '(1) possess the requisite skill, education, experience, and training for h[is] position, and (2) be able to perform the essential job functions, with or without reasonable accommodation.'"  *Fenney*, 327 F.3d at 712 (quoting *Heaser v. Toro Co.*, 247 F.3d 826, 830 (8th Cir.2001)).  MNDOT does not challenge the first element; only the second question is disputed.

"Although the plaintiff retains the ultimate burden of proving that he is a qualified individual, if the employer disputes that the employee can perform the essential functions of the job, then the burden shifts to the employer to 'put on some evidence of those essential functions.'" *Id.* (quoting *Benson v. Nw. Airlines, Inc.*, 62 F.3d 1108, 1113 (8th Cir. 1995)). Essential job functions are "the fundamental job duties of the employment position the individual with a disability holds or desires" but "does not include the marginal functions of the position." 29 C.F.R. § 1630.2(n)(1); *see Canny v. Dr. Pepper/Seven-Up Bottling Grp., Inc.*, 439 F.3d 894, 900 (8th Cir. 2006). Evidence relevant to determining whether a job function is essential includes, among potentially other things:

> (i) The employer's judgment as to which functions are essential;
>
> (ii) Written job descriptions prepared before advertising or interviewing applicants for the job;
>
> (iii) The amount of time spent on the job performing the function;
>
> (iv) The consequences of not requiring the incumbent to perform the function;
>
> (v) The terms of a collective bargaining agreement;
>
> (vi) The work experience of past incumbents in the job; and/or
>
> (vii) The current work experience of incumbents in similar jobs.

29 C.F.R. § 1630.2(n)(3); *see Dropinski v. Douglas Cnty.*, 298 F.3d 704, 707 (8th Cir. 2002).

The employer's judgment as to what functions of a job are essential is both a necessary and weighty factor to consider in identifying a job's essential functions.[4]   In *Dropinski*, an automatic-equipment operator who had suffered a back injury sued his employer—Douglas County—for disability discrimination under the ADA.  *Id.* at 705–06. The parties disputed whether some of the County's identified essential functions for the automatic-equipment-operator position were actually essential, or if they were instead marginal.  *Id.* at 707.  The County identified the essential functions of the position using a written job description as well as its own judgment as to what tasks individuals in the position should be able to perform.  *Id.* at 708.  Dropinski, the former employee, argued that the County focused on tasks that an automatic-equipment operator almost never has to perform, and that he had never performed some of the identified tasks during his five years of employment with the County.  *Id.*   The Eighth Circuit rejected these arguments, explaining:

> The fact remains, though, that the potential for these functions exist in the AEO II position and that it is difficult to describe with precision exactly what an AEO II will encounter while out working on the rural roads in Douglas County. . . . *Dropinski's specific personal experience is of no consequence in the essential functions equation.*  Instead, it is the written job description, the employer's judgment, and the experience and expectations of all AEO II's generally which establish the essential functions of the job.

*Id.* at 708–09 (emphasis added).  The court explained that even if there may not be a significant amount of time in the position spent performing a task routinely, the

---

[4]     Goosen acknowledges that "[a]n employer's judgment as to what functions are essential is to be given deference, but . . . is not conclusive."  ECF No. 40 at 21.

*consequence* of not performing the task demonstrated that it was essential. *Id.* at 709; 42 U.S.C. § 12111(8) ("[C]onsideration shall be given to the employer's judgment as to what functions of a job are essential, and if an employer has prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job.").

Here, the Work Analysis Team identified and detailed the heavy-equipment-field-mechanic position's essential functions in the Tracking Document. *See* ECF No. 37-1. The Team listed the "[r]epair and preventive maintenance for all equipment, vehicle modifications and retro-fitting of equipment" as a function of the job occurring at a "Constant" rate of frequency—meaning that it consists of "greater than 2/3 of [a] workday (greater than 5 hours and 20 minutes/day)." *Id.* The list of physical demands for this task includes: (1) use of a variety of repair tools such as torque wrenches, air hammers, hoists, jack stands, creepers, pry bars, chains, and sledgehammers in "awkward," "overhead," or otherwise dynamic positions; (2) lifting, carrying, pushing, and pulling items up to and exceeding 75 lbs. in weight; (3) entering and exiting equipment using three-point contact and "with outstretched arms;" and (4) prolonged use of impact tools in overhead positions, requiring "repeated bilateral arm, shoulder and forearm flexion, extension, internal rotation, external rotation[,] abduction, adduction and occasionally circumduction while holding objects away from the body and applying torque or hammering." *Id.* The Work Analysis Team explained: "This work is done in overhead or outstretched positions

depending on the task.  The ideal ergonomic position is very rare—hardly even 1% of the time." *Id.*  The Team determined:

> Reaching out and working with the arms is performed more than three hours nearly every day.  Performing kneel/squat may also involve the use of the arms to get back up again.  Overhead reaching, working above shoulder for up to six hours would be challenging with 10-hour shifts or when working overtime since this too is the nature of the work.

*Id.*  The Team also explained that "maintaining a three-point contact," climbing ladders or stairs, standing, walking, using upper extremities, and using vibrating tools were performed frequently.  *Id.*  And, the Team noted, because an individual in the heavy-equipment-field-mechanic position is required to work alone in remote locations, the individual "must do all the work himself and there is no assistance/flexibility."  *Id.*

The Work Analysis Team utilized multiple appropriate sources to identify the essential functions listed in the Tracking Document.  It relied on a pre-employment position description for the heavy-equipment-field-mechanic position.  ECF No. 37-1; 42 U.S.C. § 12111(8) ("[I]f an employer has prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job.").  The Tracking Document's description of the heavy-equipment-field-mechanic position's essential functions is consistent with the position description.  *Compare* ECF No. 37-1 (Tracking Document), *with* ECF No. 36-1 at 44–49 (position description).  The Work Analysis Team also properly relied on the judgment of Goosen's supervisors to identify the position's essential functions.  42 U.S.C. § 12111(8) ("[C]onsideration shall be given to the employer's judgment as to what functions of a job

are essential[.]").  Scholand and Bowe, who each have decades of experience working as mechanics and supervising mechanics, had an active role in identifying the position's essential functions.  ECF No. 36-4 at 4; ECF No. 36-3 at 3; ECF No. 36-2 at 5–6.  The Team also relied on the amount of time spent on the job performing each function, using frequency percentages supplied to Goosen (and signed by him) in 2020.  *Compare* ECF No. 37-1, *with* ECF No. 36-1 at 44–47.  Finally, the Team considered the consequences of not requiring Goosen to perform certain functions of the position, such as requiring other mechanics to either help or take over—an issue which they identified as being particularly problematic because heavy equipment field mechanics were required to work alone in remote locations.  ECF No. 37-1.

Goosen argues that two physical requirements the Tracking Document identified—reaching and working with outstretched arms for more than three hours during the workday and "climbing in and out of trucks for more than seven hours during a shift"—are not essential functions.  ECF No. 40 at 20.  He says that neither requirement appears on the position description, that pre-employment testing did not address either requirement, and that MNDOT's investigation was inadequate because it omitted particular components.

These arguments do not show there is a trial-worthy issue regarding the requirement that a heavy equipment field mechanic be able to work with arms outstretched for more than three hours.  This requirement appears on the position description.  It reads, in relevant part: "The employee *frequently* uses gross and fine dexterity in a variety of positions including reaching outward and overhead, bending, *working with outstretched arms* and/or while lying on their back (i.e. on a creeper), climbing up onto a large vehicle, working from

20

heights, and bending over." ECF No. 36-1 at 49 (emphasis added). As used in this context, "frequently" means the "activity or condition exists between 1/3 and 2/3 of workday (between 2 hours and 40 minutes/day and 5 hours and 20 minutes/day)." ECF No. 37-1.[5] The Work Analysis Team thus accurately and reasonably determined that the heavy-equipment-field-mechanic position required "[r]eaching out and working with the arms . . . more than three hours nearly every day." *Id.*[6]

The gaps Goosen identifies in the Work Analysis Team's investigation do not show a trial-worthy issue, either. Goosen cites no authority for the proposition that a function is essential only if it is the subject of pre-employment testing, and that conclusion would seem

---

[5]    In its opening brief, MNDOT asserted: "'Frequently' is described as greater than two-thirds of a shift; five hours and forty minutes of an eight-hour shift and in excess of eight hours if an HEFM shift extended past twelve hours." ECF No. 35 at 19. This is not accurate. The definition MNDOT described is for a "constant" rate of frequency. ECF No. 37-1.

[6]    There is some confusion regarding the truck-climbing function. Again, Goosen understands MNDOT to have determined that this function required a mechanic to climb in and out of trucks for more than seven hours *cumulatively* during a shift. ECF No. 40 at 20. That understanding seems difficult to accept for the simple reason that it would mean a mechanic would do nothing but climb up and down from the truck for several hours during a shift. The Tracking Document, however, lends some support to Goosen's understanding. It groups this function with several others—"climb ladder/stair, stand, walk, use upper extremities, use vibrating tools with the right upper extremity"—and says that "these are . . . performed frequently as part of the job in general." ECF No. 37-1. "Frequently" means that an "activity or condition exists between 1/3 and 2/3 of [a] workday (between 2 hours and 40 minutes/day and 5 hours and 20 minutes/day)." *Id.* And, as MNDOT confirmed at the hearing on this motion, when it says a task is performed "frequently," the periods associated with that adverb are cumulative. Whether "frequent" truck-climbing is an essential function of the heavy-equipment-field-mechanic position thus seems the subject of genuine fact disputes. These disputes do not warrant a trial because they are immaterial in view of Goosen's inability to perform the "outstretched arms" function.

at odds with Eighth Circuit precedents. *See, e.g.*, *Dropinski*, 298 F.3d at 708–09. Goosen says that MNDOT "did not consult other mechanics" in identifying the position's essential functions. This is indisputably not correct. The Work Analysis Team included Scholand and Bowe, two experienced mechanics. ECF No. 37-1; ECF No. 36-3 at 1–2 (describing Scholand's experience); ECF No. 36-2 at 6 (describing Bowe's experience). Goosen asserts that the Work Analysis Team "did not perform time studies." ECF No. 40 at 20. Goosen does not specify what he means by "time studies." Regardless, the Tracking Document, position description, and other information evaluated by the Work Analysis Team included extensive information regarding the time a heavy-equipment-field mechanic was required to spend performing particular tasks. Goosen does not explain why more information that might be obtained through additional study might be necessary or helpful. Goosen's remaining criticisms—that the Work Analysis Team "did not consider the extent to which a mechanic uses bent elbows versus outstretched arms or bracing or leverage" and that the Team "did not consider the impact of reaching arms outstretched while back is braced on a creeper"—concern exceedingly exacting factors, and Goosen has not explained how answering these questions might be material to defining the position's essential functions.

Goosen seems to acknowledge that he was unable to work with his arms outstretched for more than three hours as the position required. His treating physician indisputably imposed this limitation. ECF No. 36-1 at 59. And Goosen does not address the issue in his brief. *See* ECF No. 40 at 22–23.

This leaves only the reasonable accommodation branch of the analysis.  "[I]f the employee cannot perform the essential functions of the job *without* an accommodation, he must only make a 'facial showing that a reasonable accommodation is *possible* . . . .'" *Fenney*, 327 F.3d at 712 (quoting *Benson*, 62 F.3d at 1113).  If the employee makes that *prima facie* showing, "'[t]he burden of production [then] shifts to the employer to show that it is unable to accommodate the employee.'"  *Id.* (quoting *Benson*, 62 F.3d at 1113).  "'If the employer can show that the employee cannot perform the essential functions of the job even with reasonable accommodation, [then] the employee must rebut that showing with evidence of his individual capabilities.'"  *Id.* (quoting *Benson*, 62 F.3d at 1113).

Goosen fails at step one.  He makes no attempt to identify any reasonable accommodation or accommodations that might allow him to perform the essential functions of the heavy-equipment-field-mechanic position.  Goosen argues that MNDOT might have accommodated him by transferring him to a heavy-equipment-mechanic position.  ECF No. 40 at 23–25.  Framed this way, Goosen hasn't done what the law requires to get past summary judgment.

"[I]n certain situations, reassignment to a *vacant* position can be a reasonable accommodation, where the employee can perform the essential functions of the new position."  *Minnihan v. Mediacom Commc'ns Corp.*, 779 F.3d 803, 814 (8th Cir. 2015) (emphasis added).  "Reassignment is not required of employers in every instance, however, and is 'an accommodation of last resort' when the employee cannot be accommodated in his existing position."  *Id.*  "In the case of a reassignment, the employer is not required to create a new position nor move other employees from their jobs in order to open up a

position." *Id.* "To show that reassignment is a possible accommodation, the plaintiff must make a facial showing that a position is available for which he qualifies." *Ehlers v. Univ. of Minn.*, 34 F.4th 655, 660 (8th Cir. 2022) (citations omitted).

Goosen has failed to show that a position is available for which he qualifies; he has not shown the availability of an open position at any relevant time. Goosen argues that "given his seniority, Goosen would have been able to "bump" into the [heavy-equipment-mechanic] position." ECF No. 40 at 25. To support this assertion, Goosen relies on the affidavit testimony of former AFSCME union representative Richard Frauendienst. In his affidavit, Frauendienst testifies only that "[t]here was a mechanism under the applicable collective bargaining agreement by which Robert Goosen could have been bumped into an HEM (Heavy Equipment Mechanic) position, providing there was a less senior mechanic in the shop at that time." ECF No. 46 (emphasis added). Frauendienst does not testify either that there was a less senior mechanic in the shop or that "bumping" Goosen into a position was actually possible. *See id.* Regardless, Goosen's position directly contradicts controlling Eighth Circuit precedent holding that employers are not required to move other employees from their jobs to open up a new position. *Minnihan*, 779 F.3d at 814.

Goosen asserts that he was told at the meeting on April 28, 2021, that moving him to a heavy-equipment-mechanic position might be a "viable option." *See* ECF No. 40 at 24. Goosen does not explain, however, why it might matter that he came away from this meeting with a belief that he would be offered a different position, and the record shows beyond dispute that no such offer was promised or made. *See* ECF No. 36-1 at 29; ECF No. 36-5 at 1:32:38–1:33:20.

24

Goosen also argues that his separation from MNDOT occurred "because Scholand subjectively believed that Goosen could not perform the work." ECF No. 40 at 22. According to Goosen, Scholand "wanted someone in the position who was '100 percent,' not damaged goods." *Id.* at 22–23. Goosen argues: "Requiring an employee to be '100 percent' ignores the congressional mandate that employers provide reasonable accommodation to disabled employees." *Id.* at 23. This contention is premised on Scholand's deposition testimony. There, Scholand was asked whether the diminishment of Goosen's remaining leave had an "impact" on Scholand. ECF No. 41-2 at 12. After describing the three-and-one-half years Goosen had been on leave or unavailable to work as a heavy equipment field mechanic as "a long journey to try to get a full complement in the shop," Scholand explained that he "was anxious to have people that could do 100 percent of their duties." *Id.* In light of Goosen's failure to show a position was available, it is difficult to understand how this aspect of Scholand's testimony might be material.

\*

Goosen has not identified record evidence from which a jury might reasonably determine that he is a "qualified individual"—*i.e.*, that he was able to perform the essential functions of the heavy-equipment-field-mechanic position, with or without reasonable accommodation. For this reason, summary judgment will be entered in MNDOT's favor on Goosen's "reasonable accommodation" ADA claim.

## ORDER

Based on the foregoing, and on all the files, records, and proceedings herein, **IT IS ORDERED THAT**:

1.      Defendant Minnesota Department of Transportation's Motion for Summary Judgment [ECF No. 33] is **GRANTED**.

2.      Plaintiff Robert Wayne Goosen's Complaint is **DISMISSED WITH PREJUDICE**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Date:  May 18, 2023

s/ Eric C. Tostrud
Eric C. Tostrud
United States District Court